## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Michael P. Hamilton,

                Petitioner,      Case No. 19 -12619

v.                                Judith E. Levy
                                     United States District Judge

Randee Rewerts,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS [1], DENYING CERTIFICATE OF APPEALABILITY AND DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

Michael P. Hamilton, ("Petitioner"), confined at the Carson City Correctional Facility in Carson City, Michigan, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 through Christine A. Pagac and Michael R. Waldo of the State Appellate Defender Office. Petitioner challenges his conviction for first-degree premeditated murder, Mich. Comp. Laws § 750.316, assault with intent to commit murder, Mich. Comp. Laws § 750.83, two counts of possession of a firearm during the commission of a felony, [felony-firearm], Mich. Comp. Laws §

750.227b, and two counts of unlawfully driving away an automobile, Mich. Comp. Laws § 750.413.

For the reasons set forth below, the Court dismisses the petition, denies a certificate of appealability, and denies permission to proceed in forma pauperis on appeal.

## I.   Background

Petitioner was convicted following a jury trial in the Jackson County Circuit Court. "The facts as recited by the Michigan Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1)." *Shimel v. Warren*, 838 F.3d 685, 688 (6th Cir. 2016). Those are as follows:

> On September 8, 2012, Richard Marcyan and his brother, Robert Marcyan, went to 1789 Wamplers Lake Road to look at the cottage's deck. Defendant's father, Mark Hamilton, had asked Richard about making some repairs to it. At the cottage, Richard and Robert spoke with defendant. While Richard was subsequently speaking with Mark on the telephone, defendant went inside the cottage and came back to the deck. He had a shirt over his hand. Richard then heard a "bang" and a "boom," and when he looked over at Robert, Robert was lying on the deck, bleeding. As Richard called 911, he heard more gunshots. Richard ran through the neighboring yards. When the gunfire stopped, Richard was standing near the trunk of Robert's car, a BMW. Defendant was near the car's hood. Defendant pointed a gun at Richard, smiled, and pulled the

trigger. No bullets fired. After Richard ran to a neighboring house, defendant drove off in Robert's car. Defendant crashed the car, and then he drove off in a pick-up truck. At trial, defendant did not dispute that he committed the charged crimes. Rather, he claimed that he was legally insane on September 8, 2012, because he was involuntarily intoxicated from Adderall, which he had been prescribed.

*People v. Hamilton*, No. 319980, 2016 WL 514288, at *1 (Mich. Ct. App. Feb. 9, 2016).

After Petitioner's conviction, the trial court conducted an evidentiary hearing on Petitioner's ineffective assistance of counsel claim pursuant to *People v. Ginther,* 390 Mich. 436 (1973). The evidentiary hearing was held before Judge McBain on December 12, 2014, after which Judge McBain ruled that trial counsel had not been ineffective. (*See* Petitioner's Appendix A.) (ECF No. 1-2.)

Petitioner's conviction was affirmed by the Michigan Court of Appeals. *People v. Hamilton*, No. 319980, 2016 WL 514288 (Mich. Ct. App. Feb. 9, 2016) (Shapiro, J., dissenting).

The Michigan Supreme Court remanded the case to the Michigan Court of Appeals for that court to reconsider Petitioner's claim regarding the qualification and testimony of prosecution expert witness Rosemary Heise. The Court found that the Michigan Court of Appeals erred in

3

determining that Heise's testimony was harmless because it was arguably cumulative. The Michigan Supreme Court denied Petitioner leave to appeal with respect to his remaining claims. *People v. Hamilton*, 500 Mich. 938 (2017).

On remand, the Michigan Court of Appeals again determined that the admission of Heise's testimony was harmless error. *People v. Hamilton*, No. 319980, 2017 WL 3316958 (Mich. Ct. App. Aug. 1, 2017) (Shapiro, J., dissenting); *lv. den.* 501 Mich. 1094 (2018) (McCormack, Justice, dissenting).

Petitioner seeks a writ of habeas corpus on the following ground:

> Mr. Hamilton was denied his Sixth Amendment right to the effective assistance of counsel where his trial attorney failed to present, or failed to discover through a reasonable investigation, evidence which would have directly contradicted the prosecution's assertion that Mr. Hamilton attempted to break into a neighbor's cottage, had broken into his parents' cottage, and was in the process of stealing property from his parents' cottage when the Marcyan brothers arrived at the cottage, and that his motive for shooting Robert Marcyan was an attempted robbery.

(ECF No. 1.)

## II.   Legal Standard

4

A § 2254 habeas petition is governed by the heightened standard of review set forth in the Anti-Terrorism and Effective Death Penalty Act (AEDPA). 28 U.S.C. § 2254. To obtain relief, habeas petitioners who raise claims previously adjudicated by state-courts must "show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.'" *Wilson v. Sellers*, 138 S. Ct. 1188, 1191 (2018) (quoting 28 U.S.C. § 2254(d)).

The focus of this standard "is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007). The "AEDPA thus imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." *Renico v. Lett*, 559 U.S. 766, 773 (2010) (internal citations and quotation marks omitted).

Ultimately, "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Additionally, a state-court's factual determinations are presumed correct on federal habeas review, 28 U.S.C. § 2254(e)(1), and review is "limited to the record that was before the state court." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

## III. Discussion

Petitioner argues that trial counsel was ineffective for failing to call Petitioner's mother, Bernadette Hamilton, to offer testimony that would have rebutted the prosecution's theory that Petitioner's motive for shooting the victim was part of an armed robbery or theft. Petitioner claims that this testimony would have bolstered his insanity defense.

To show that he was denied the effective assistance of counsel under federal constitutional standards, a defendant must satisfy a two-prong test. First, the defendant must demonstrate that, considering all of the circumstances, counsel's performance was so deficient that the attorney was not functioning as the "counsel" guaranteed by the Sixth Amendment. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In so doing, the defendant must overcome a strong presumption that counsel's

behavior lies within the wide range of reasonable professional assistance. *Id*. In other words, Petitioner must overcome the presumption that, under the circumstances, the challenged action might be a sound trial strategy. *Strickland,* 466 U.S. at 689. Second, the defendant must show that such performance prejudiced his defense. *Id*. To demonstrate prejudice, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694. "*Strickland*'s test for prejudice is a demanding one. 'The likelihood of a different result must be substantial, not just conceivable.'" *Storey v. Vasbinder*, 657 F.3d 372, 379 (6th Cir. 2011) (quoting *Harrington*, 562 U.S. at 112). The Supreme Court's holding in *Strickland* places the burden on the defendant who raises a claim of ineffective assistance of counsel, and not the state, to show a reasonable probability that the result of the proceeding would have been different, but for counsel's allegedly deficient performance. *See Wong v. Belmontes*, 558 U.S. 15, 27 (2009).

On habeas review, "the question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard

'was incorrect but whether that determination was unreasonable– a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland's* standard." *Harrington v. Richter*, 562 U.S. at 101. Indeed, "because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard." *Knowles,* 556 U.S. at 123 (citing *Yarborough v. Alvarado*, 541 U.S. at 664). Pursuant to the § 2254(d)(1) standard, a "doubly deferential judicial review" applies to a *Strickland* claim brought by a habeas petitioner. *Id.* This means that on habeas review of a state-court conviction, "[A] state court must be granted a deference and latitude that are not in operation when the case involves review under the *Strickland* standard itself." *Harrington*, 562 U.S. at 101. "Surmounting *Strickland's* high bar is never an easy task." *Id.* at 105 (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010)).

Because of this doubly deferential standard, the Supreme Court

has set forth that:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard.

*Harrington v. Richter*, 562 U.S. at 105.

In addition, a reviewing court must not merely give defense counsel the benefit of the doubt but must also affirmatively entertain the range of possible reasons that counsel may have had for proceeding as he did. *Cullen v. Pinholster,* 563 U.S. 170, 196 (2011).

As set forth above, after Petitioner's conviction, the trial court conducted a hearing on Petitioner's ineffective assistance of counsel claim pursuant to *People v. Ginther,* 390 Mich. 436 (1973). The evidentiary hearing was held on December 12, 2014, after which the judge ruled that trial counsel had not been ineffective. (*See* Petitioner's Appendix A.) (ECF No. 1-2.)

Petitioner's mother, Bernadette Hamilton, testified that she attended Petitioner's trial. (ECF No. 1-2, PageID.68.) Mrs. Hamilton identified People's Exhibit 16 as a photo of the family cottage taken from

the lakeside. In the photo, one of the six sliding screen doors on the lakeside of the cottage is missing. (*Id.* at PageID.70.) Mrs. Hamilton testified that she removed the screen door, which had been broken while being cleaned, and had taken it in to be repaired in July or August of 2012, before the date of the incident. (*Id.* at PageID.71–72.) As of the date of the incident, the screen had not been replaced, since the repair company had gone out of business. The company had not returned the screen door to the Hamiltons. (*Id.* at PageID.73.)

Mrs. Hamilton testified that Exhibit 23 was a photo showing the inside of the cottage. The photo showed a brown bag which Mrs. Hamilton indicated was often used by the family members to transport their personal belongings. Exhibit 24 again showed the brown bag containing a boom box or X-box, and a DVD player that belonged to Petitioner. Mrs. Hamilton testified that Petitioner often took these items to and from the cottage when he went there from his home. Mrs. Hamilton testified that she did not see anything in the bag that belonged solely to her or her husband. Mrs. Hamilton indicated that everyone in the family would use these devices when Petitioner had them at the cottage or left them there. She testified that Exhibit 26 showed, among other things in the cottage,

a red bag (which was originally a dog blanket) containing items including a lantern that was going to be hung outside the cottage and several DVDs that belonged to Petitioner. (*Id.* at PageID.75–76.) She further testified that Exhibit 25 showed several tools belonging to the family that were lying on the cottage floor. Mrs. Hamilton testified that Petitioner had his own key to the cottage for years and that he had access to use or stay there whenever he wanted. (*Id.* at PageID.78–79.)

Mrs. Hamilton identified a letter she wrote and sent to Judge McBain on November 24, 2013, just before Petitioner's sentencing. (*Id.* at PageID.79–80.) In that letter, she informed the judge that Petitioner had a key to the cottage, the items that he had allegedly attempted to steal from the cottage in fact belonged to him, the screen door had been removed before the date of the incident, and that her neighbor told her the screen on his house had been torn before that date. (*Id.* at PageID.78–80.) (*See* Letter in Appendix D of Petitioner's Motion for a New Trial, ECF No. 6-17, PageID.1916–1918.)

Mrs. Hamilton stated she spoke to a police officer before trial and informed the officer that Petitioner had his own key to the cottage. The officer did not ask Mrs. Hamilton about the missing screen door, so she

did not discuss that with him. The police officer did not ask her about the items shown in the prosecution's photographs. (ECF No. 1-2, PageID.80–82.)

Mrs. Hamilton testified that she spoke to Petitioner's trial counsel before the trial and told him that Petitioner had his own key, that she had removed the screen door before September 8, and that the property in the photos belonged to Petitioner. During the trial, she asked her son's attorney whether he was going to put this information on the record, and he responded affirmatively. Mrs. Hamilton was not called to testify during the trial. (*Id.* at PageID.82–83.)

On cross-examination Mrs. Hamilton acknowledged that she and her husband have been sued by the murder victim's family in connection with this incident, and she acknowledged that her testimony at the *Ginther* hearing may have some bearing on that civil suit. (*See* ECF No. 6-16, PageID.1788.) Mrs. Hamilton testified on re-direct that the civil suit was filed in late 2014, two months before the *Ginther* hearing. She sent the letter to Judge McBain containing the same information about Petitioner's key, the missing screen, and the property in the house in November of 2013. (*Id.* at PageID.84–85.)

The other defense witness at the hearing was George Lyons, Petitioner's appointed trial counsel. Lyons testified that Petitioner was charged with premeditated murder, and not charged with felony-murder, attempted armed robbery, or home invasion. The defense raised at trial was insanity due to involuntary intoxication with Adderall. (*Id.* at PageID.90.)

Mr. Lyons testified that he recalled the prosecution's opening argument which asserted a lack of motive in the case. (*Id.* at PageID.91.) Mr. Lyons stated it was likely, but he could not recall if he asked the police officer on the stand if he knew who owned the items shown in the photographs taken at the Hamilton cottage. Mr. Lyons testified that he had objected to the prosecution's question to the officer about his theory of what happened in the case, and that the officer answered that he thought the cottage showed a "classic interrupted home invasion with items being placed on the blanket." Lyons testified that, before the trial, he spoke to Petitioner's parents and was told Petitioner had free access to the cottage but could not remember whether the Hamiltons told him that Petitioner had a key to the cottage. Mr. Lyons testified that he heard nothing from the prosecution about the missing screen door until the

evidence was presented at trial and he did not recall discussing the missing screen with the Hamiltons. (*Id.* at PageID.92–93.) Mr. Lyons further testified that, before the beginning of the trial, "it did not appear to be a major issue …because robbery wasn't on the table. No one was breaking and entering." Mr. Lyons recalled that the prosecution presented evidence of the missing screen at trial, and that the screen on a neighbor's cottage had been sliced. (*Id.* at PageID.94).

Mr. Lyons testified that he spoke to Petitioner and his parents about the objects shown in the prosecution's exhibit photos before the trial. (*Id.* at PageID.94–95). He also indicated that the five photos were shown to Mrs. Hamilton during the *Ginther* hearing and he stated "I don't think there was ever any question that the things either belonged to Mike or his parents." (*Id.* at PageID.96).

Mr. Lyons recalled that the prosecution's closing argument alleged that Petitioner attempted to break into the neighbor's cottage, then broke into his parents' cottage and was gathering items to steal for drugs when the murder victim and his brother arrived unexpectedly at the cottage. (*Id.* at PageID.96–98). Mr. Lyons also testified that it was proper for the prosecution to change their theory of criminal liability during the trial

14

itself but conceded that before the trial he had not anticipated the prosecution would assert claims of attempted robbery or home invasion. (*Id*. at PageID.98–99). Mr. Lyons could not recall why he asked the police officer in cross-examination if he knew who owned the items shown in the photos. He agreed that he recognized during trial that the prosecution was changing its theory and that his cross-examination was directly related to the officer's testimony, to which he objected, that it looked as if a break-in had occurred at the cottage. (*Id*. at PageID.100–01).

Mr. Lyons admitted he did not call Petitioner or Petitioner's mother to testify at the trial. Mr. Lyons acknowledged that evidence that Petitioner had his own key to the cottage, that Mrs. Hamilton had removed the screen before the date of the shooting, and that most of the items shown in the photos from inside the cottage actually belonged to Petitioner would not have been damaging to the defense. (*Id*. at PageID.102–04). Mr. Lyons indicated that the Hamilton's neighbor testified about a torn screen at another house. (*Id*. at PageID.104–05).

When asked why he did not call Mrs. Hamilton as a witness, Mr. Lyons testified that it was a strategic decision. After prepping Mrs. Hamilton for potential testimony, Mr. Lyons testified that he decided she

15

would not be a viable or credible witness for the defense as to the insanity defense. He also testified that he did not want to expose her to cross-examination. (*Id.* at PageID.105–06). Upon further questioning from the judge, Mr. Lyons testified that he was afraid that Mrs. Hamilton's testimony during cross-examination would have undermined the insanity defense. (*Id.* at PageID.106–07).

On cross-examination, Mr. Lyons characterized the prosecutor who tried the case, Katie Hanna–Rezmierski, as a "deadly" cross-examiner. (*Id.* at PageID.108). He could not recall exactly when during the trial "when it – it became obvious that their theory – that you guys' theory was morphing." (*Id.* at PageID.111).

The prosecution presented testimony from two witnesses at the *Ginther* hearing. Jared Hopkins is an attorney who started practice in 2005, was initially an assistant prosecutor in Jackson County, and is now a defense attorney who has responsibility to provide trial representation to indigent defendants in that County. Mr. Hopkins testified that he was not an attorney of record for Petitioner, did not attend much of the trial, but assisted Mr. Lyons prior to the trial. Mr. Hopkins helped Mr. Lyons prepare Mrs. Hamilton for possible testimony at the trial and agreed with

16

Mr. Lyons' decision not to call her as a witness. Mr. Hopkins also characterized Ms. Hanna–Rezmierski as an aggressive cross-examiner. (*Id.* at PageID.117–20). Mr. Hopkins opined:

> My conclusion was for the defense that Mr. Lyons was going to put on[,] she [Mrs. Hamilton] wouldn't have helped. All she would have done was hurt the cause. Like I said, I think she's a very sweet woman and I think she loved her son, but as a prosecutor, Katie, I think, and I know I would have, would have used that against her on the stand and would have got into more of the decline of Mr. Hamilton's drug use.

(*Id.* at PageID.120).

Mr. Hopkins testified that he was not aware the prosecution would change its theory from premeditated to felony-murder; thus, their preparation of Mrs. Hamilton did not include any consideration of whether Petitioner had a key to the cottage, why the screen door was missing, or who owned the items shown in the photos. (*Id.* at PageID.122–23). Mr. Hopkins testified that he would not have been concerned, had he been Petitioner's trial counsel, about the prosecution changing their theory in the middle of trial, saying "it was clear that Mr. Newton and Ms. Rezmierski were freaking out because they didn't have a motive, so they were grasping at straws…" (*Id.* at PageID.123). Mr.

17

Hopkins further testified that he thought the felony-murder theory "never was an issue" during the trial. (*Id.* at PageID.124).

The final witness was Katie Hanna-Rezmierski, one of the two trial prosecutors in the case. Ms. Hanna–Rezmierski testified that before the trial, neither she nor Mr. Newton, the other prosecutor in this case, came up with a robbery motive in the case. They went into the opening argument "believing that [they] had no motive." Ms. Hanna–Rezmierski acknowledged that during the trial, the prosecution theory changed, after she reviewed the evidence again and saw a quote attributed to Petitioner in which he described the victim to the defense expert as "a person who looked like he had money." (*Id.*, PageID.130).

Ms. Hanna–Rezmeirski stated she interviewed the victim's brother about the jewelry the victim was wearing on the date of the shooting, which included a Rolex watch and several valuable rings and necklaces. (*Id.* at PageID.131). The victim drove a "fancy" BMW or Mercedes. Ms. Hanna–Rezmeirski testified that this evidence, combined with the evidence of the missing screen at the Hamilton's cottage, the torn screen at the neighbor's cottage, and the items found in the bags inside the Hamilton cottage, lead her to believe that Petitioner was engaged in an

act of theft from his family's cottage when Robert Marcyan and his brother arrived unexpectedly, and that the subsequent shooting was motivated by Petitioner's intent to rob Mr. Marcyan of his jewelry. (*Id.* at PageID.132–133). Ms. Hanna–Rezmeirski stated that if the defense presented evidence to the jury that Petitioner had a key to the family cottage, that the screen had been removed before September 8, and that the items shown in the photos mainly belonged to Petitioner, she still would have presented a robbery motive to the jury because she believed the evidence showed Petitioner on that date was a "drug addict" who was desperate to get money to buy more drugs. (*Id.* at PageID.133).

Ms. Hanna–Rezmeirski testified that she believed the trial evidence was "overwhelming" that Petitioner needed money to buy drugs. (*Id.* at PageID.135–37). Ms. Hanna–Rezmeirski also testified that she believed that one of the members of the Marcyan family told her Mr. and Mrs. Hamilton had revoked Petitioner's right to use the family cottage. Ms. Hanna–Rezmeirski testified that she had hoped that Petitioner's mother would testify. (*Id.* at PageID.138–139). While the prosecutor was testifying, Mrs. Hamilton disrupted the proceedings and was almost removed from the courtroom. (*Id.* at PageID.139).

19

Ms. Hanna–Rezmeirski testified that she spoke to Mr. Newton, who gave the opening statement at the trial, about what he was going to say, and agreed with him telling the jury that the prosecution did not know what the Petitioner's motive was and that they would not be presenting any evidence of a motive. Subsequent to the opening argument, the prosecution theory clearly changed. (*Id*. at PageID.143). Ms. Hanna–Rezmeirski testified that she read defense expert Dr. Wendt's report, which included the quote from Petitioner about Mr. Marcyan "looking like he had money," prior to the trial. (*Id*. at PageID.145). She further testified that this quote was in the context of Petitioner telling Dr. Wendt he believed he was in a movie, that Mr. Marcyan also was a character in that movie, and that Mr. Marcyan's costume in the movie was that of a drug dealer. Ms. Hanna–Rezmeirski asserted she took that one comment as an admission by Petitioner that he intended to rob Mr. Marcyan. (*Id*. at PageID.145–47).

Ms. Hanna–Rezmeirski summarized that even if evidence had been presented that Petitioner had permission to enter his family cottage, the prosecutor would still have argued robbery as the motive for Petitioner to kill Robert Marcyan based on the fact Petitioner was addicted to drugs,

had been out of work for weeks, and had told Dr. Wendt that the victim looked like he had money (wearing jewelry and driving a BMW). (*Id*. at PageID.155, 159).

The judge rejected Petitioner's ineffective assistance of counsel claim and his request for a new trial, finding that counsel was not ineffective for failing to call Petitioner's mother as a defense witness as follows:

> Ma'am, I've had enough. Among other things, I take judicial notice of the fact that she [Mrs. Hamilton] can't hardly contain herself even in this hearing. I almost had to have her removed. Ms. Rezmierski would have taken her apart on the witness stand.
>
> And we -- we don't even have a key. Not once has anybody shown me that there was ever a key. Now, maybe he did have permission. Maybe he had to take the screen off and maybe he had to force his way in because he didn't have a key. It's certainly as logical of an interpretation of the evidence as you offered.
>
> I certainly don't think that there's any reasonable probability of acquittal based on the fact that the state argued kind of a combined home invasion with stuff that really doesn't look very stealable, but ultimately had good strong circumstantial evidence of robbery and -- and so, I -- I -- I'm certainly not finding any basis on the authority that the defense has cited to grant a new trial. The motion for a new trial is denied.

(*Id.* at PageID.185).

The Michigan Court of Appeals also rejected Petitioner's claim on his appeal of right as follows:

> During its opening statement, the prosecution told the jury that it could not provide a motive for the shooting of Robert. However, during closing argument, the prosecution argued that money was a motive for the shooting. Specifically, the prosecution argued that defendant was a drug addict who was out of money and that, on September 8, 2012, in order to obtain money for his drug habit, defendant attempted to break into a neighboring house, broke into his parents' cottage and bagged up items, and shot Robert. Defendant had told Dr. Jeffery Wendt that Robert looked like he had money. According to defendant, defense counsel was ineffective for failing to discover and present evidence that a screen on the neighboring house was torn before the day of the shooting, that the window screen was missing from the cottage because it had been sent for repairs, that defendant had a key to the cottage, and that the items in bags in the cottage belonged to defendant. Defendant claims that defense counsel should have called his mother, Bernadette Hamilton, to testify to these facts.
>
> Decisions regarding whether to call witnesses are presumed to be matters of trial strategy. Assuming without deciding that defense counsel should have been aware that the prosecution changed its theory regarding motive during trial and that defense counsel knew or should have known of the facts that defendant claims would have been testified to by Bernadette, defense counsel's performance in failing to call Bernadette as a witness to prevent the prosecution from

arguing that defendant had engaged in larcenous conduct on September 8, 2012, did not fall below objective standards of reasonableness.

At the evidentiary hearing, defense counsel testified that he had a strategic reason for not calling Bernadette as a witness. He did not believe that Bernadette would make a credible witness, and Bernadette would be subject to vigorous cross-examination, in which the prosecution could elicit testimony that would undermine the insanity defense. Jared Hopkins, who played the prosecutor in mock cross-examinations of Bernadette, testified that Bernadette could not have helped the defense that defense counsel planned; she would only hurt it. In addition, he explained that the prosecution would have used Bernadette's affection for defendant against Bernadette and would have gotten into defendant's past drug use with Bernadette. Testimony by Mary Hanna–Rezmierski, one of the prosecutors, at the evidentiary hearing, as well as statements by the trial court, confirm that defense counsel had a valid strategic reason for not calling Bernadette as a witness. Hanna–Rezmierski testified that she wanted Bernadette to testify because there were fertile areas for her to explore on cross-examination, including defendant's mental health and addiction issues. The trial court, upon watching Bernadette at the evidentiary hearing, stated that Hanna–Rezmierski would have taken Bernadette apart on cross-examination.

Admittedly, defense counsel made the decision not to call Bernadette as a witness before trial commenced. Even after the prosecution's change in theory regarding motive, defense counsel's strategic reasons for not calling Bernadette as a witness remained valid. Although Bernadette could have offered testimony that rebutted the prosecution's theory that

defendant engaged in larcenous conduct on September 8, 2012, there remained the dangers that the jury would not view Bernadette as a credible witness and that the prosecution, through its cross-examination of Bernadette, would elicit testimony that would undermine the insanity defense. Where the only defense asserted to the charged crimes was that defendant was legally insane and where there was a danger that Bernadette, if she testified, would give testimony that undermined the defense, defendant has failed to overcome the strong presumption that defense counsel's performance in not calling Bernadette as a witness was sound trial strategy. Accordingly, defendant has failed to show that defense counsel's performance fell below objective standards of reasonableness.

*People v. Hamilton*, 2016 WL 514288, at *2–3 (internal citations omitted).

The Michigan Court of Appeals' rejection of Petitioner's ineffective assistance of counsel claim was reasonable, precluding habeas relief. This is not a case where trial counsel failed to consider Mrs. Hamilton as a possible defense witness or to interview her before trial. Petitioner's trial counsel met with Mrs. Hamilton and even had another attorney, Mr. Hopkins, play prosecutor and cross-examine Mrs. Hamilton. Mr. Lyons testified that after meeting with Mrs. Hamilton, he did not believe that she would make a credible witness and would even undermine the insanity defense that Petitioner advanced at trial. Both Mr. Lyons and Mr. Hopkins feared that Mrs. Hamilton would undercut the insanity

24

defense under cross-examination from the prosecutor, particularly on issues relating to Petitioner's history of drug addiction, which would have undermined Petitioner's insanity defense because voluntary intoxication is not a defense, Mich. Comp. Laws § 768.37, nor can it be used to show insanity, Mich. Comp. Laws § 768.21a(2).

The Michigan Court of Appeals' determination that trial counsel's failure to call Mrs. Hamilton to testify did not amount to deficient performance that prejudiced the result of the trial, but was a strategic decision based on an assessment of the witness' credibility, was a reasonable application of *Strickland*, precluding habeas relief. *See McConer v. Burt*, 795 F. App'x 329, 332 (6th Cir. 2019); *see also Cathron v. Jones*, 77 F. App'x 835, 839 (6th Cir. 2003) (counsel was not ineffective in failing to call alibi witnesses to testify in defense of defendant at his second trial, even though they had testified at his first trial, where counsel was aware of witnesses and knew precisely to what each would testify and how credible each was as a witness, thus leading to the presumption that counsel's decision to omit their testimony was trial strategy).

The Michigan Court of Appeals' decision is buttressed by the trial judge's determination at the *Ginther* hearing that he did not believe that Mrs. Hamilton would have made a good witness, even noting that she had made an outburst from the spectator section of the courtroom while Ms. Hanna–Remeirski testified during the *Ginther* hearing.

While the ultimate question of ineffective assistance of counsel is a mixed question of law and fact, the factual findings of state courts underlying such an analysis are accorded the presumption of correctness in federal habeas proceedings. *See Abdur'Rahman v. Bell*, 226 F.3d 696, 702 (6th Cir. 2000). This is particularly so where credibility determinations are involved. *See e.g. Mix v. Robinson*, 64 F. App'x 952, 956 (6th Cir. 2003). The presumption of correctness "also applies to those implicit findings of fact that are inherent in [a state court's] resolution of conflicting evidence." *McPherson v. Woods*, 506 F. App'x 379, 387 (6th Cir. 2012). In order to overturn this presumption of correctness, a habeas petitioner must either show that the record as a whole did not support the factual determination or he must prove by clear and convincing evidence that the factual determination was erroneous. *See Poole v. Perini*, 659 F.2d 730, 736 (6th Cir. 1981). In denying Petitioner's

ineffective assistance of counsel claim, the trial judge concluded, based on his observations of Mrs. Hamilton at the *Ginther* hearing, that counsel was not ineffective for concluding that she would not have made a good witness and would not have changed the outcome of the case. Petitioner presented no evidence to this Court to rebut the trial judge's credibility finding.

Furthermore, although not specifically discussed by the Michigan Court of Appeals in its decision, there were other reasons to reject Petitioner's ineffective assistance of counsel claim. Under § 2254(d), "a habeas court must determine what arguments or theories supported or...could have supported, the state court's decision; and then it must ask whether it is possible fair-minded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Harrington*, 562 U.S. at 102.

Although defense counsel did not call Mrs. Hamilton to rebut the prosecution's theory that Petitioner shot the victim in the process of an armed robbery or theft, the parties at the *Ginther* hearing stipulated that defense counsel cross-examined Sergeant Watson on the second day of trial about whether he knew who owned the items in the cottage.

27

Defense counsel did, in fact, cross-examine Sergeant Scott Watson twice during the trial in an attempt to rebut Sergeant Watson's theory that this was a robbery gone bad. Sergeant Watson admitted that he did not know who the DVDs found in the bag belonged to and did not know whether the DVDs belonged to Petitioner or his parents. (ECF No. 6-8, PageID.700.) Defense counsel obtained an admission from Sergeant Watson that he never inquired whether Petitioner had a key to his parents' cottage, nor did Watson inquire into whether Petitioner had free access to the cottage. (*Id*. at PageID.702.) Watson admitted he did not inquire who the DVD players found at the cottage belonged to. (*Id*. at PageID.707.)

When Sergeant Watson was called later in rebuttal, defense counsel obtained an admission from Sergeant Watson that he made no attempt to determine the source of the money recovered from Petitioner at the time of arrest. Sergeant Watson admitted that he had no information from his discussions with the murder victim's brother that Petitioner had taken anything from the murder victim. (ECF No. 6-13, PageID.1512.) Sergeant Watson also admitted that he had no idea when the screen from

28

the cottage had been removed or who had done taken it out. (*Id*. at PageID.1512–13.)

In his closing argument, defense counsel argued that there was no discussion of an armed robbery by the prosecution when the incident initially occurred, which was thirteen months before trial. (ECF No. 6-14, PageID.1669–70.) Counsel called the armed robbery theory a "red herring" and argued that the prosecutor would have charged Petitioner with armed robbery if they believed the evidence supported the charge. (*Id*. at PageID.1673.) Counsel later argued that Sergeant Watson had no proof that Petitioner had committed a home invasion and that Petitioner had not been charged with home invasion. (*Id*. at PageID.1682.)

Trial counsel's decision to cross-examine Sergeant Watson to impeach his robbery and theft theory, rather than calling Mrs. Hamilton to impeach this theory, is a reasonable trial strategy that defeats Petitioner's ineffective assistance of counsel claim. *See United States v. Munoz*, 605 F.3d 359, 378 (6th Cir. 2010) (counsel not ineffective for failing to present character witnesses on behalf of the defendant when he elicited favorable character evidence about the defendant from the government's star witness); *Shaba v. United States*, 721 F. Supp. 132,

136 (E.D. Mich. 1989), aff'd, 896 F.2d 554 (6th Cir. 1990) (defense counsel's failure to call defendant's brother to testify concerning his prior food stamp violations was not ineffective assistance of counsel, where testimony expected from brother was elicited through cross-examination of the government's informant).

Petitioner was not prejudiced by counsel's failure to call Mrs. Hamilton to rebut Sergeant Watson's theory that the shooting took place during a robbery or home invasion because Mrs. Hamilton's proposed testimony was cumulative of other evidence in support of Petitioner's argument that there was no evidence that Petitioner was committing a home invasion or armed robbery at the time of the shooting. *Wong v. Belmontes*, 558 U.S. at 22-23; *see also United States v. Pierce*, 62 F.3d 818, 833 (6th Cir. 1995); *Johnson v. Hofbauer*, 159 F. Supp. 2d 582, 607 (E.D. Mich. 2001). In this case, the jury had significant evidence presented to it to call into question Sergeant Watson's theory. Because the jury was "well acquainted" with evidence that would have supported Petitioner's argument that there was no evidence that a home invasion or armed robbery took place, additional evidence in support of

Petitioner's defense "would have offered an insignificant benefit, if any at all." *Wong*, 558 U.S. at 23.

## IV.  Certificate of Appealability

Petitioner is required to obtain a certificate of appealability (COA) in order to appeal the Court's decision. *See* 28 U.S.C. § 2253(c)(1)(a); Fed. R. App. P. 22(b). A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Reasonable jurists would not debate the correctness of the Court's ruling. Therefore, the Court will deny a certificate of appealability.

An appeal from this decision cannot be taken in good faith. *See* Fed. R. App. P. 24(a). Accordingly, the Court denies Petitioner leave to proceed in forma pauperis on appeal. *See* 28 U.S.C. § 1915(a)(3).

## IV.   Conclusion and Order

For the reasons set forth above, the petition is DENIED AND DISMISSED WITH PREJUDICE and a certificate of appealability is DENIED. Petitioner is DENIED leave to appeal in forma pauperis on appeal.

IT IS SO ORDERED.

31

Dated: June 15, 2021                     s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 15, 2021.

                                         s/William Barkholz
                                         WILLIAM BARKHOLZ